RANDY S. GROSSMAN
United States Attorney
VALERIE H. CHU
California Bar No. 241709
MICHELLE WASSERMAN
California Bar No. 254686
Assistant U.S. Attorneys
880 Front Street, Room 6293
San Diego, California 92101-8893
Telephone:(619) 546-6750

Attorneys for Plaintiff
United States of America

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No.  22CR0821-BAS |
|---|---|---|
| v. | ) ) ) | **UNITED STATES'** |
| ELLIOT ADLER, | ) ) | **SENTENCING MEMORANDUM** |
| Defendant. | ) ) ) ) | Date: August 19, 2022<br>Time: 10:00 a.m. |

**I**

**INTRODUCTION**

Over decades, Rabbi Yisroel Goldstein of the Chabad of Poway recruited prominent members of the community to participate in tax crimes. These included distinguished professionals and business owners, many of whom gave every outward appearance of being pillars of the community and models of propriety. Despite their education, their accomplishments, and their financial successes, however, time and again these individuals succumbed to the pressure and influence to join Rabbi Goldstein in his schemes to scam the tax system. The list of participants, unfortunately, is long and distinguished, and included: Bruce Baker, a La Jolla pediatric dentist; Stuart Weinstock, an Escondido businessman and the former own of Salsa Market; Jason Ellis, former Qualcomm director; Yousef Shemirani and Bijan Moossazadeh, founder and former vice president,

respectively, of the Baron's Market grocery chain; Goldstein's brother, Mendel Goldstein, and fellow Rabbi Yehuda Hadjaj, former director of Chabad at UCSD.

Longtime San Diego attorney Elliot Adler ("Adler" or "Defendant") joins this ignominious cast of characters. Over nearly a decade, between 2010 and 2018, Adler conspired with Rabbi Goldstein to defraud the United States and file false tax returns. Unlike all of the Rabbi's other co-conspirators, Defendant Adler is a licensed attorney. Unlike the other co-conspirators, Adler's participation in the scheme involved receiving $1 million back in gold coins from the Rabbi in 2018. While it could not have been a mystery to Adler that his charitable donation was a sham, he took the sizeable tax write-off anyway for that tax year, reducing his tax liability by a whopping $447,000 for that year alone.

Adler's conduct cannot be erased by claims that Rabbi Goldstein imposed a moral obligation or wielded insurmountable influence over him. While those may have eased his conscience about participating, there is no question that Adler chose to write sham donation checks in the amounts he chose, and to use coded language to communicate with the Rabbi, revealing his corrupt intent throughout the many years of his participation.

Like the others convicted in this scheme, Adler presents significant equities, and a custodial sentence will undoubtedly impose a hardship on him and his family. Nonetheless, to account for the full breadth and depth of his crimes, to recognize his own history and circumstances, and to avoid unwarranted sentencing disparities, the United States submits that a custodial sentence of 15 months is appropriate.

## II

## STATEMENT OF FACTS

According to California state bar records, Adler has been a licensed attorney in the state of California since 2003. As set forth in his plea agreement, since at least 2006, Adler has run his own boutique law firm. He has generated significant income recovering millions of dollars on behalf of plaintiffs.

Adler conspired with Rabbi Goldstein beginning at least as early as 2010, and continuing through October 2018, to cheat on his taxes. To carry out the scheme, Adler gave money to Goldstein, disguised as charitable or religious donations to the Chabad. In return, Goldstein generated a receipt on Chabad letterhead falsely acknowledging Adler's "generous tax-deductible donation." Then, rather than using the purported donations for charitable purposes, Rabbi Goldstein secretly funneled approximately 90% of the funds back to Adler, keeping approximately 10% of the money as his agreed upon fee. Thus, 100% of Adler's purported donation was diverted and none of the funds were actually given to the Chabad as a charitable donation. Adler then falsely claimed to his tax preparers that 100% of his payments to the Chabad were tax-deductible charitable contributions, without disclosing that Goldstein had secretly returned most of the money to him. In tax years 2011 through 2017, Defendant Adler signed tax returns filed with the IRS in which he falsely claimed that he had made the fraudulent charitable donations. In doing so, Adler fraudulently reduced his tax liability by approximately $505,659 for those tax years.

In order to conceal and hide their conduct, Adler and Rabbi Goldstein communicated using coded language. For example, Goldstein referred to cash as "challah[1]" and his source of cash as "the baker," and when Goldstein proposed meeting to deliver cash, he invited Adler to "wrap tefillin."[2]

The conspiratorial conduct in each of the tax years reflects a concerted effort to deceive and cheat, that snowballed in scope over time. In the early years of the scheme, Defendant Adler gave fake "donations" of tens of thousands of dollars. For example, as

---

[1] Challah is a braided ceremonial bread that observers of the Jewish faith eat to mark either the beginning of Shabbat, or other major Jewish holidays. Because Shabbat begins on Friday nights, any "baker" could tell you that "challah" made days beforehand would be quite stale.

[2] "Wrapping tefillin" refers to a practice of tying small black boxes (phylacteries) onto the arm and forehead that contain scrolls of parchment inscribed with verses from the Torah. Tefillin is generally worn by adult male Jews during weekday morning prayers.

part of the scheme, on December 6, 2012, Rabbi Goldstein deposited a check for $20,000 from Adler, payable to Chabad of Poway, which included the memo: "Donation." A few weeks later, on December 21, 2012, Goldstein deposited another check for $20,000 from Adler. The following year, on October 15, 2013, Goldstein deposited a check for $22,000 from Adler. On December 31, 2014, Goldstein deposited a check for $10,000 from Adler.

As the scheme continued, the amounts of Adler's sham donations increased, presumably as Adler achieved greater financial success (which concomitantly increased his tax liability). On January 11, 2016, Rabbi Goldstein deposited a check for $30,000 from Adler, which was dated December 17, 2015. And on December 23, 2016, Goldstein deposited a check for $44,000 from Adler.

As he was giving these donations, Adler and Rabbi Goldstein exchanged coded text messages discussing the cash that Rabbi Goldstein would return to Adler. For instance, on October 19, 2015, Goldstein sent a text message to Adler alerting him that he had cash available: "I just got a call from the Baker he may be in this Friday do you still need Chalah?" Similarly, on December 4, 2015, Rabbi Goldstein sent a text message to Adler which stated: "Eliot how are you the Baker needs to know if you need any Chala[h] before the year end[.]"[3] Not long after the new year, on Thursday, January 7, 2016, at approximately 7:55 am, Rabbi Goldstein texted Adler again: "Good morning I got the challah[.] What time?" That same day, January 7, 2016, at approximately 8:00 am, Adler replied to Rabbi Goldstein by text: "Monday morning 8am at shul or today before 12pm if you can come to my office." Rabbi Goldstein responded: "Monday @ 8 is fine[.]" Adler confirmed: "See you then."

In 2017, the scope of the crimes – and the cover up – grew dramatically. At the end of 2017, on December 25, Adler reached out to Rabbi Goldstein asking to meet with him. Shortly thereafter, Rabbi Goldstein deposited two sequentially numbered checks from

---

[3] The Jewish faith does not require challah to be purchased "before the year end." To be counted as deductions for a tax year, however, charitable deductions typically must be given by the end of the year.

4

Adler, one for $180,000 dated December 25, 2017, and one for $980,000 dated December 29, 2017, each payable to the Chabad of Poway and each with the memo: "Donation." Rabbi Goldstein provided Adler with a donation receipt letter for each of these checks, once again memorializing Adler's sham "generous tax-deductible donation." The return of funds to Adler, though, still needed to be discussed. On Friday January 5, 2018, Rabbi Goldstein sent Adler a coded text message: "Let me know if you're around sometime this week that we can get together and wrap teffilin?" Adler proposed: "How about Monday?" Rabbi Goldstein agreed.

This time, instead of returning the million dollars to Adler in cash, Rabbi Goldstein wired approximately $1,000,000 to a wholesale and retail jeweler on January 10, 2018, to purchase a total of 738 ounces of gold, in the form of 246 Suisse Fortuna 1-ounce rectangular gold ingots, 246 Canadian Maple Leaf 1-ounce gold coins, and 246 American Eagle 1-ounce gold coins. When he received the gold, Rabbi Goldstein placed it in his safe deposit box at Wells Fargo Bank for safekeeping. Using the same coded language, on January 17, 2018, Rabbi Goldstein texted Adler to ask, "When can you come [i]n for a teffilin wrap? I'm ready for you." The next day, Rabbi Goldstein delivered the million dollars' worth of gold to Adler.



The conspirators were not done with the sham donations for 2017, however. On February 1, 2018, Rabbi Goldstein deposited another check for $18,000 from Adler, payable to Chabad of Poway, which was backdated to December 30, 2017.

That fall, Adler provided his tax preparer with a summary of his "Charitable Contributions" for tax year 2017. He claimed that he donated to Chabad of Poway: (i) $180,000 on December 25, 2017; (ii) $980,000 on December 29, 2017; and (iii) $18,000 on December 30, 2017. Adler did not reveal to his tax preparer that he had secretly received approximately $1 million in gold back from Rabbi Goldstein.

On October 8, 2018, Adler's electronic Individual Income Tax Return Form 1040 for the 2017 tax year was e-filed. In this return, Defendant Adler falsely claimed that he had donated approximately $1,187,000 to charity, and in doing so, fraudulently reduced his 2017 tax liability by approximately $447,673.

Shortly thereafter, on October 18, 2018, Rabbi Goldstein told Adler that he was under investigation by the IRS and had been the subject of an undercover operation relating to tax evasion. He asked for Adler's help to prove, falsely, that Rabbi Goldstein had possession of the gold coins purchased with Adler's purported donation. That same night, just after midnight, Adler arrived at Rabbi Goldstein's home and returned the gold coins.

### III
### SENTENCING RECOMMENDATION

**A. GUIDELINES CALCULATIONS**

The United States recommends the following Guidelines calculations:

1. Base Offense Level [§2T1.1(a)(1); §2T4.1(G)] ...................................... 18
2. Acceptance of Responsibility [§3E1.1] ................................................... -3
3. Total offense level .............................................................................. 15

At Offense Level 15 and criminal history category I (PSR ¶ 40), Adler's Guidelines range is 18-24 months.

## B. NO ADDITIONAL GUIDELINES DEPARTURES ARE WARRANTED

When evaluating whether family responsibilities warrant a downward departure, the burden is on the defendant to show circumstances that are extraordinary. It is the sad reality that "prison sentences normally disrupt[] … parental relationships." *United States v. Miller*, 991 F. 2d 552, 553 (9th Cir. 1993). In considering such a departure, courts often look to whether a defendant is an irreplaceable caretaker for a family member or his children. *See, e.g. United States v. Leon*, 341 F.3d 928, 931–33 (9th Cir. 2003) (affirming a downward departure for defendant who, since other family members were "deceased or otherwise unavailable," was the sole provider of support to a suicidal wife); *United States v. King*, 280 F.3d 886, 888-89 (8th Cir. 2002) (reversing downward departure because although defendant's wife had advanced arthritis, her parents lived next door, and there was no showing she could not care for their children).

Here, despite Ms. Adler's medical condition, it appears she can care for herself, is relatively young (PSR ¶ 46), is a licensed attorney herself and has a role in the operation of the Adler Law Group, the law firm Defendant founded (PSR ¶ 62).[4] Moreover, Defendant's parents (PSR ¶ 42) and three siblings (PSR ¶ 44) all reside in San Diego and are available to provide support to Ms. Adler and Defendant's children.[5] *See United States v. Young*, 105 F. App'x 926, 927 (9th Cir. 2004) (vacating downward departure because defendant's family circumstances–a mother in poor health and three siblings an hour away–were not extraordinary because he was not an "irreplaceable caretaker for his mother").

While Defendant's three children may be young,[6] they are reportedly healthy and

---

[4] The Adler Law Group website lists Ellen Adler as "Senior Trial Counsel" and "Principal" of the law firm, and touts her accomplishments at the firm in a biography page. *See* Exhibit A.

[5] Defendant has described his relationship with his parents and siblings as "close." (PSR ¶ 42-44)

[6] It appears that Defendant's youngest child was born approximately one (1) year after Defendant and Ms. Adler were made aware of the Government's investigation into Defendant's tax fraud.

7

have the care and support of Defendant's wife, Ms. Adler, along with grandparents and aunts and uncles nearby. *Compare United States v. Aguirre*, 214 F.3d 1122, 1127 (9th Cir.2000) (affirming downward departure where defendant's common law husband died during her incarceration, leaving their young child without a parent or guardian); *United States v. Sweeting*, 213 F.3d 95, 98-102 (3d Cir. 2000) (vacating downward departure where defendant was a single parent of a child with Tourette's Syndrome, because the record–that defendant helped her son with his treatment of diet and exercise–did not show defendant was "so irreplaceable" as to make circumstances extraordinary). Moreover, it is the United States' understanding that the Adlers have, in the past and at present, had childcare help in the form of a nanny. This is not surprising given that Defendant and Ms. Adler were both working lawyers and, prior to his resignation earlier this year, Defendant worked 80-100 hours per week. PSR ¶ 62.

The United States understands that Defendant's absence from the family will cause hardship, but as his family circumstances are neither unique nor extraordinary, the United States submits that no further departure is warranted on this basis. *See Miller*, 991 F.2d at 556 (vacating a downward departure for a married defendant who provided "substantial emotional and physical support to [her] two young children, the youngest of which was [] born while the case was pending," noting that defendant's husband was able to continue to provide support to the family).

### C. ADDITIONAL SENTENCING FACTORS UNDER § 3553(a)

After calculating the applicable Guidelines, the United States turns to the sentencing factors. In this case, after considering the § 3553(a) factors, the United States recommends a slight downward variance to **15 months** to account for Defendant's history and characteristics, the need for just punishment and to afford general deterrence, and to avoid unwarranted sentencing disparities. The United States believes that a 15-month sentence satisfies the §3553(a) factors, and submits that no further downward departures or

variances are appropriate, given, in particular, the need to avoid unwarranted sentencing disparities among co-conspirators.[7]

### 1. Nature and Circumstances of the Offense, and the History and Characteristics of the Defendant [18 USC §3553(a)(1)]

Defendant Adler participated in this scheme year after year, knowing that he was defrauding the IRS by allowing Rabbi Goldstein to exploit the tax exemption for charitable donations, and by then claiming the sham donations as legitimate deductions off his own income tax returns. Defendant Adler had the education, privilege, and success to earn tens of thousands of dollars in income running a very successful and lucrative law practice. But rather than pay his fair share, he instead chose to cheat on his taxes, all the while presumably enjoying a reputation as a major donor to the Chabad and a successful attorney in the community. It is hard to explain why an individual as educated, sophisticated, and privileged as Adler would decide to engage in this scheme – not just once, but repeatedly, over 8 years. Ultimately, although he claims the rabbi exercised moral and spiritual influence over him (not unlike the other defendants charged in this matter), Adler's brazen conduct can only be explained by greed, opportunity, and the assumption that he would not get caught.

As to his history and characteristics, Defendant Adler will undoubtedly submit many letters from well-wishers and supporters, citing his good works and contributions to the community. Warm letters from friends, family, and colleagues may be honest and heartfelt. But they are not atypical in white-collar cases. "[E]xcellent character references

---

[7] The United States respectfully disagrees with the conclusion of the U.S. Probation Officer that Defendant's law-abiding life and the collateral consequences of this conviction warrant a dramatic downward variance to a non-custodial sentence. First, Defendant's conduct was not isolated or aberrant; he executed the tax fraud scheme over approximately 8 years – he just happened not to be caught until 2018. Second, the collateral consequences to Adler are not extraordinary when compared to those suffered by other white-collar defendants, who may be CPAs, financial advisors, doctors, chiropractors, attorneys, real estate brokers or other licensed professionals, not to mention Congressmen, Naval Officers, city council members or other public figures.

are not out of the ordinary for an executive who commits white-collar crime; one would be surprised to see a person rise to an elevated position in business if people did not think highly of him or her." *United States v. McClatchey*, 316 F.3d 1122, 1135 (10th Cir. 2003). Courts should "view such evidence with the skepticism of experience in sentencing executives who commit white-collar offenses." *Id. See also*, *e.g.*, *United States v. Della Rose*, 435 F.3d 735, 738 (7th Cir. 2006) (supportive letters "by no means out of the ordinary" because privileged white-collar offenders "often have impressive records of civic and philanthropic achievement"); *United States v. Morken*, 133 F.3d 628, 630 (8th Cir. 1998) ("record of good works is neither exceptional nor out of the ordinary for someone of his income and preeminence"); *United States v. Kohlbach*, 38 F.3d 832, 837-39 (6th Cir. 1994) (not unusual for white-collar offender to have been leader in community charities, civic organizations, church efforts, and have performed prior good works). While it is commendable that Defendant Adler has accomplished positive things, ultimately his privileged history and characteristics make him more culpable. *United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir. 1999) ("[c]riminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.")

**2. Need for sentence imposed to reflect seriousness of the offense, promote respect for law, provide just punishment, afford adequate deterrence, and protect public [18 USC §3553(a)(2)]**

There is no question that the conduct underlying this case was serious. Instead of respecting the law, Defendant Adler -- a lawyer -- flouted the law year after year, in increasingly larger amounts, and by 2017, he tried to erase nearly half a million dollars in tax liability. Adler then agreed to facilitate Rabbi Goldstein's attempt to conceal the crime by delivering the gold back to the rabbi in the middle of the night.

Defendant Adler may contend that he has been adequately punished through the loss of his business, the harm to his reputation, and the loss of his law license. These collateral consequences may have influenced the Probation Office's non-custodial

10

recommendation as well.  But collateral harm of this kind is hardly unusual in the white-collar setting, and section 3553(a)(2) specifically directs courts to consider "the need for the *sentence* imposed" to meet a number of goals.  Financial, reputational, and professional harm are not part of a defendant's sentence.  Nor are they consequences specifically of the sentence.  Based on this analysis, federal courts have concluded that it would be improper to rely upon these sorts of collateral consequences to satisfy the sentencing goals laid out in § 3553(a)(2).  *See United States v. Tamarin*, 851 Fed. Appx. 726, 729 (9th Cir. 2021) (affirming a "high-end Guidelines sentence" of a doctor involved in Medicare fraud by holding that the likely loss of his medical license "and resulting financial ruin" were the natural consequences of his crime and did not permit a downward departure)*; United States v. Musgrave*, 761 F.3d 602, 604 (6th Cir. 2014) (holding that to provide a CPA convicted of bank and wire fraud with a downward departure due to the collateral consequences of his felony conviction would be to impermissibly favor the elite, noting that "[n]one of these things are his sentence[,] [n]or are they consequences of his sentence"); *United States v. Cutler*, 520 F.3d 136, 170-72 (2d Cir. 2008) (holding that the collateral consequences suffered by an attorney convicted in a bank fraud scheme–"public humiliation and the loss of his license to practice law"–were not unusual, and, through adverse, did not constitute punishment under this provision).  Considering yet another attorney convicted of a felony, a federal judge explained,

> [Jewell] argues also that if the conviction is upheld he will lose his law license permanently, which he says is additional punishment that should be considered. It is no doubt true that the investigation and prosecution over the past several years have been expensive for Jewell and have involved substantial mental anguish. It is also true that Jewell likely will never practice law again. Nevertheless, the Court rejects those as appropriate considerations in determining the proper sentence under 18 U.S.C. § 3553(a)(2).

*United States v. Jewell*, 2009 WL 1010877, at *11 (E.D. Ark. Apr. 15, 2009), *aff'd*, 614 F.3d 911 (8th Cir. 2010).

More than running afoul of the statutory text, crediting such factors also raises more fundamental concerns: it has the doubly perverse effect of favoring privileged offenders who, by virtue of the very privilege they bemoan losing, are arguably *more* culpable:

> It is natural for judges, drawn as they (as we) are from the middle or upper-middle class, to sympathize with criminals drawn from the same class. But in this instance we must fight our nature. Criminals who have the education and training that enables people to make a decent living without resorting to crime are more rather than less culpable than their desperately poor and deprived brethren in crime.

*United States v. Stefonek*, 179 F.3d 1030, 1038 (7th Cir.1999) (citation omitted). *See also United States v. Morgan*, 635 Fed. App'x 423, 445-46 (10th Cir. 2015) (holding that consideration of white-collar collateral consequences "impermissibly favor[s] criminals . . . with privileged backgrounds"). As the First Circuit has cautioned, "[I]t is impermissible for a court to impose a lighter sentence on white-collar defendants than blue-collar defendants because it reasons white-collar defendants suffer greater reputational harm or have more to lose by conviction." *United States v. Prosperi*, 686 F.3d 32, 47 (1st Cir. 2012)). Echoing this concern, the Sixth Circuit in *United States v. Peppel*, 707 F.3d 627, 636 (6th Cir. 2013), overturned a light sentence motivated by collateral consequences (in particular, reputational harm) on the ground that "humiliation before his community, neighbors, and friends—would tend to support shorter sentences in cases with defendants from privileged backgrounds, who might have more to lose along these lines."

Courts are also critical of leniency based on professional sanctions. The Tenth Circuit in *Morgan* overturned a probationary sentenced based, in part, on the defendant's loss of his law license. *Morgan, supra,* 635 Fed. App'x at 446. In *Musgrave* the Sixth Circuit overturned an extremely low sentence that was premised, in part, on the "likely loss of [the defendant's] CPA license" and his substantial "legal fees." 761 F.3d at 608. The Second Circuit in *Cutler* found that it was not within a sentencing court's discretion to impose a lighter sentence on the basis that the attorney defendant would likely lose his law license, because this was a routine outcome of a felony conviction. 520 F.3d at 170.

The need for significant sentences to achieve deterrence is especially pronounced in tax cases, as the Sentencing Commission has noted. In *United States v. Bragg*, 582

F.3d 965, 969–70 (9th Cir. 2009), the Ninth Circuit remanded a district court's probationary sentence in a $1.2 million tax loss case. The Ninth Circuit chastised the sentencing court for suggesting that deterrence does not work in tax cases, a position at odds with the Sentencing Commission's view. "Because of the limited number of criminal tax prosecutions relative to the estimated incidence of such violations, deterring others from violating the tax laws is a primary consideration underlying these guidelines," the Ninth Circuit said, quoting from the Sentencing Manual, and further noting that the Sentencing Commission proscribed a policy of prison for tax offenses. *United States v. Bragg*, 582 F.3d 965, 969–70 (9th Cir. 2009), citing U.S. SENTENCING GUIDELINES MANUAL ch. 2, pt. T, introductory cmt. *See also United States v. Hayes*, 62 F.3d 1300, 1308 (11th Cir. 2012) ("general deterrence is an important factor in white-collar cases, where the motivation is greed"); U.S.S.G. Ch. 1 Pt. A(4)(d) ("[T]he definite prospect of prison [for economic crime], even though the term may be short, will serve as a significant deterrent, particularly when compared with pre-guidelines practice where probation, not prison, was the norm.").

### 3. Avoiding unwarranted sentencing disparities [18 USC § 3553(a)(6)]

The sentence imposed must also avoid unwarranted disparities among individuals guilty of similar conduct. The United States submits that a non-custodial sentence for Adler would be disparate with sentences imposed on similarly situated co-defendants. Mendel Goldstein, who similarly participated over a number of years but whose tax loss was only $155,881 – and who, just before sentencing, was the recipient of a kidney transplant – was sentenced to 8 months in custody. Bijan Moossazadeh, who engaged in the fraud for six years and was responsible for tax losses of $91,500, was sentenced to 3 months in custody. Stuart Weinstock, who participated over years and caused tax loss of $182,506 – whose wife suffers from serious a medical condition – was sentenced to 8 months in custody. Seventy-five-year-old retired dentist Dr. Bruce Baker–suffering from leukemia–who caused tax losses of $607,829 and proactively cooperated with law enforcement, was sentenced to 15 months in custody.

The United States believes that a sentence of **15 months** would fulfil the purposes of this sentencing factor with respect to Adler, who caused tax loss of $505,659, and, uniquely, received gold bars and then returned them to help the Rabbi hide his crimes.

## IV

## RESTITUTION AND FINE

### A. RESTITUTION

The United States requests that the Court order Defendant to pay restitution to the Internal Revenue Service in the total amount of $1,049,573.67, reflecting the total amount of restitution below:

| Tax Year(s) | Amount to be Credited to Tax | Fraud Penalty Under Title 26 U.S.C. § 6663 | Interest, estimated and computed to 10/31/2021 Under Title 26 U.S.C. § 6601 | Total |
|---|---|---|---|---|
| 2011 | $5,200.00 | $3,900.00 | $3,894.22 | $12,994.22 |
| 2012 | $13,684.00 | $10,263.00 | $9,239.21 | $33,186.21 |
| 2013 | $7,322.00 | $5,491.50 | $4,418.90 | $17,232.40 |
| 2014 | $8,960.00 | $6,720.00 | $4,784.24 | $20,464.24 |
| 2015 | $10,500.00 | $7,875.00 | $4,886.89 | $23,261.89 |
| 2016 | $12,320.00 | $9,240.00 | $4,665.85 | $26,225.85 |
| 2017 | $447,673.00 | $335,754.75 | $132,781.11 | $916,208.86 |
| **Total** | **$505,659.00** | **$379,244.25** | **$164,670.42** | **$1,049,573.67** |

The United States will submit a proposed draft restitution order under separate cover.

### B. <u>FORFEITURE</u>

The United States requests that the Court order forfeiture of the following at the time of sentencing:

- 246 Suisse Fortuna 1 oz. rectangular gold ingots;
- 246 Canadian Maple Leaf 1 oz. gold coins; and

- 246 American Eagle 1 oz. gold coins.

The United States will submit a proposed draft forfeiture order under separate cover.

## V
## CONCLUSION

For the foregoing reasons, the United States respectfully requests that this Court impose a sentence of 15 months, order restitution of $1,049,573.67, and order forfeiture of the gold.

DATED: August 11, 2022                     Respectfully submitted,

RANDY S. GROSSMAN
Acting United States Attorney


/s/ Michelle L. Wasserman
MICHELLE L. WASSERMAN
Assistant U.S. Attorney