Patrick Q. Hall, CA Bar No. 97019
Lauren M. Hofflin, CA Bar No. 310005
Law Offices of Patrick Q. Hall
501 W. Broadway, Suite 730
San Diego, California 92101
Telephone:  (619) 268-4040
pat@pqhlaw.com

John C. Ellis, Jr., CA Bar No. 228083
Law Offices of John C. Ellis, Jr.
2495 Truxtun Road, Suite 206
San Diego, California 92106
Telephone: (619) 501-5522
john@johnellislaw.com

Attorneys for ELLIOT ADLER

## UNITED STATES DISTRICT COURT

### SOUTHERN DISTRICT OF CALIFORNIA
(Hon. Cynthia A. Bashant)

| | |
|---|---|
| UNITED STATES OF AMERICA, | CASE NO. 22-CR-821-BAS-1 |
| Plaintiff, | **DEFENDANT ADLER'S SENTENCING MEMORANDUM** |
| vs. | |
| ELLIOT ADLER, | **DATE: July 11, 2022** |
| Defendant. | **TIME: 9:00 a.m.** |

**I.**
**INTRODUCTORY STATEMENT**

"The good that a person has done in their life should count for something."

Hon. Norbert Ehrenfreund

Elliot Adler has repeatedly demonstrated through his actions that he has been an exceptional person throughout his life.  His numerous supporters describe him as a role model, mentor, great friend, loyal husband, adoring father and devoted family man—extremely involved in the daily activities of his three children.  His colleagues in the legal

community, and even those who have opposed him in court, describe him as a dedicated attorney, who has used his time to not only build a successful law practice and advocate fiercely for his clients, but more importantly going way beyond the call of duty to help his clients in addition to handling numerous pro bono cases. He has rented apartments with his own money to assure that clients are not living in their cars. He has paid for needed surgeries for clients. He has even paid for school supplies for the children of clients, to assure that their education is not interrupted after a life changing event. He has cut or completely waived his fees to help resolve cases.

Elliot Adler is also a person who has contributed his time and energy to helping the community—literally giving the sweatshirt off his back to someone in need or making anonymous donations so that underprivileged children have basketball uniforms. He has run unsuccessfully for the school board, served soup to unhoused people, delivered meals to the undernourished, and donated his time to exonerate a man wrongly convicted.

Thus, it is not at all surprising that those who know him are truly astounded that he ever got involved in something like this. Many of his friends and family note the significant impact Rabbi Goldstein had in Elliot Adler's life, suggesting that the rabbi's status as a religious leader obviously influenced Mr. Adler becoming involved in this scheme that apparently the rabbi had been organizing for years prior to even knowing Elliot Adler. However, these same friends and family consistently note in their many letters to the court that Elliot Adler blames himself for his life-changing and horrible decisions, not the rabbi. They have all spoken with Mr. Adler and all remark about his incredibly sincere remorse for ever becoming involved—a sincere remorse which reaffirms that Mr. Adler will never do something like this again.

The consequences for Elliot Adler for this conviction, a successful attorney respected by many, are far more severe than for anyone else prosecuted in related cases. He was not at the end of his professional career, as others involved with Rabbi Goldstein, but rather just reaching the height of his career. With a plea to a felony charge pending, Mr. Adler recognized that everything he had worked so hard for was all forfeit: The law

2

firm which he built from a solo practice to a striving 20-person law firm—gone. The roughly 5,000 clients he had personally met with in large part and was representing in wildfire or other litigation—all now represented by other counsel. The law license he had worked so hard to obtain, working odd jobs to pay for tuition and even living in a tent to save money for law school—gone. His reputation in the community as the trustworthy and reliable individual people can rely on—forever tarnished and stigmatized by this conviction. The repercussions from his involvement in this case have affected every aspect of his life. He has lost his career, his business, his reputation, and his self-esteem. As a result, everything Elliot Adler has ever worked for has already been lost or damaged before any sentence is imposed.

Even the "fruits" of the crime, the gold the rabbi purchased on Mr. Adler's behalf, is gone. That gold, valued at approximately $1 million at the time, is now worth much more, approximately $1.5 million. Nonetheless, Mr. Adler has agreed to forfeit his property, something no other defendant charged in this tax scheme has been compelled to do. As a result, on top of interest and fraud penalties, Mr. Adler will end up paying approximately three times what he sought to avoid paying on his taxes—an extremely significant financial penalty. Clearly, the message to the public from such a large forfeiture should send a clear financial deterrent—Risk forfeiting far more than you sought to save if you do what Elliot Adler did!

Thus, at the age of 45, after working tirelessly to build a professional foundation, Elliot Adler now faces the intimidating and frightening prospect of having to start over. As noted by others including the Probation Officer, the word "remorse" does not even begin to describe the sentiments he has for his actions. He is ashamed, humiliated, and an outcaste from his prior life. With everything that has happened, quite simply he is not the same man today that he was when he committed this offense. There is no chance that he will ever do something like this again.

To reinforce that notion, Elliot Adler contacted Professor Timothy Casey and offered both to personally lecture to law students or even serve as a case study in Professor

Casey's textbook.  Professor Casey holds an appointment at California Western School of Law as Professor in Residence and Director of the STEPPS Program (a second-year required course in legal ethics, lawyering skills, and professionalism).  He also serves as a Visiting Professor of Law at the University of San Diego School of Law, teaching Professional Responsibility.  Thus, Mr. Adler has offered to tell his own story to the world to help other lawyers not follow the same wrong path.  These actions go above and beyond the mere iteration of the words "I'm sorry."  These efforts reflect the actions of a man intent on changing himself, by personally exposing and discussing his worst actions, in an effort to improve the profession.

The difficult question before the court at this time is what sentence to impose which properly takes into consideration the nature of the offense and the need for general deterrence, while balancing out the many good things Elliot Adler has done in his life, his family and the life-altering consequences he has already suffered.  Mr. Adler respectfully submits that under the factors set forth in Title 18 U.S.C. §3553, a variance/departure from the guideline range sentence would fully serve the purposes of protecting the public, while at the same time adequately deterring him from ever doing something like this again.  He is therefore requesting that the court depart/vary to impose a split sentence of six months custody, followed by six months house arrest, and a condition of supervised release that he perform 250 hours of volunteer/community service.  Mr. Adler respectfully requests that the court consider a portion of his sentence as home confinement as an alternative that does not unduly affect his family given their unique circumstances.

## II.
## THE PLEA AGREEMENT

Based on the written plea agreement, the parties have agreed to the following advisory guideline calculations:

Base Offense Level [§ 2T4.1; § 2T4.1(G)]                                    18

Acceptance of Responsibility, USSG § 3E1.1(a)                         -3

The defendant may seek additional departures or adjustments and the Government may oppose additional departures or adjustments.  "The United States will recommend

that Defendant be sentenced to the low end of the advisory guideline range as calculated by the United States pursuant to this agreement." (Plea Agreement, Page 13, Ln 16-18.)

### III.

### A Twelve Month Split Sentence is Reasonable and Appropriate.

#### A. Elliot ADLER's Personal Background, Education, and Family

Elliot Adler was born and raised in San Diego County.  During his elementary school years, the family lived in the South Bay.  However, as a teenager, his family moved to Poway.  It was during those teenage years that Elliot Adler first met Rabbi Goldstein.

Elliot Adler's father, Nathan, was a real estate developer.  His mother, Caren, devoted her time to raising Elliot and his three siblings, Andrea, Jaclyn, and Gabriel. Elliot Adler is the oldest of the four children.

Elliot Adler was always a good student and was active in sports in high school. After graduating from high school, Elliot Adler left San Diego and attended New York University where he received a Bachelor of Arts degree in Politics in 1999.  Immediately after graduating, he continued his education at the Yeshiva University, Benjamin N. Cardozo School of Law.  He ultimately obtained his juris doctorate in 2002.

As an undergraduate, Elliot Adler worked multiple part-time jobs to help put himself through school.

> "We quickly learned to understand and appreciate his work ethics when he went on to college, took out student loans and worked multiple jobs in order to assist us in paying for his undergraduate university degree." (Nathan and Caren Adler, Exhibit W).

After law school, Elliot Adler lived in New York for a short time.

> "Post-education in New York, he lived very modestly, went to work long hours at a firm, lived on a futon with roommates in 'then affordable' Stuyvesant Town, dressed simply, played street basketball on weekends, wasn't a drinker or partier, rarely went to restaurants and enjoyed the outdoors at every opportunity." (Justin Nadi, Exhibit T).

In the mid 2000's, Elliot Adler returned to San Diego.  He took the California Bar exam and was admitted to practice in California in December 2003.  He at first worked for the San Diego Legal Aid society, for those who could not afford traditional legal services.  Shortly thereafter, Mr. Adler began working with his father and brother in the

real estate development business.  However, when the financial crisis hit in 2008, the real estate market in San Diego crashed and all three were out of work.  Things were so desperate for his father and brother, that they lost their home and ended up living in spare rooms in Rabbi Goldstein's residence for a period of time.

In that same year (2008), Elliot married his wife, Ellen, who is the daughter of Ukrainian immigrants and is also an attorney.  Elliot and Ellen have three children, B.A, age 13, A.A, age 11, and D.A, age 3 and they all currently reside in Carmel Valley.

Throughout his life, Elliot Adler has been actively involved in his faith, attending services regularly.  As noted, as a teenager, he first met Rabbi Goldstein and the rabbi was later a significant influence in convincing him to attend Cardozo School of Law.

> "Religion has always played an outsized role in Elliot's life. His maternal grandfather was very involved in the community, and founder of a religious elementary and middle school, and Elliot has always followed his example when it comes to respect and trust toward religious leaders." (Travis and Jaclyn Lash, Exhibit QQ).

Even today, Elliot Adler maintains his commitment to religion, but this time attending the Chabad of Pacific Beach.

> "Over the last 2 1/2 years, I saw Elliot at synagogue almost every Saturday morning with his children. His son was preparing for his Bar Mitzvah." (Dr. Raymond Poliakoff, Exhibit Z).

Growing up in San Diego, Mr. Adler has developed many remarkable friendships and acquaintances who have written to the court to provide background about the type of person Elliot Adler truly is.

> "As a youngster, he would open doors for people or offer to give his seat to someone in crowded waiting area." (Sami Ladeki, Exhibit P).

> "He is a kind and warm person, who routinely treats others with respect and generosity." (Jim Neil, Exhibit V).

After high school, Elliot Adler continued his involvement in sports, routinely playing basketball as part of a group of approximately 100 men.  A member of that basketball league described him as follows:

> "Elliot is the only person in our group that everyone agrees is the kindest, fairest and most decent among us." (Jay Gonzalez, Exhibit KK).

22-CR-821-BAS-1

His acts of kindness have not been limited to the basketball courts.  Mr. Adler throughout his life has gone out of his way to help others.  He mentored countless others, whether in the practice of law, such as adult children of Jay Gonzalez and Jim Neil, or for his cousin, Ian White, in his studies:

> "I have no doubt that Elliot went out of his way to build my son's confidence and provide him an inspiration and skill set to do impactful work in the community." (Jim Neil, Exhibit V).

> "As I struggled to find my pathway in school, my cousin helped me focus my studies, ultimately helping me reach the position of business owner that I hold today."  (Ian White, Exhibit UU).

He was always willing to lend a helping hand, to console those in pain, or just to help with advice to those struggling with a personal problem:

> "Elliot was there when I arrived with my U-Haul to help me unload into my new apartment with my wife 5 months pregnant." (Justin Nadi, Exhibit T).

> "My (Yehiel) father passed away recently, and Elliot immediately reached out to me, not only with his condolences but with an offer to help with any needs.  We had to fly overseas, and Elliot invited our son to stay with his family while we were gone." (Yehiel and Bracha Navon, Exhibit II).

> "Elliot always had sage advice about the trickiest of moral dilemmas.  He always advocated for kindness, understanding, and empathy toward all others." (Edward Manor, Exhibit K).

The many letters submitted in his support depict a dedicated family man, a kind man, a good friend, a mentor and a person willing to help others in all aspects of their lives.  That character shined through in his professional life as well.

**B. Elliot Adler's Professional Career**

After facing unemployment in the real estate world in 2008, Elliot Adler turned back to the practice of law as a solo practitioner.  In 2009, Adler Law Group handled any type of case that walked in the door--the first year of full-time practice, he only represented approximately five clients; the second year, only nine clients.  Those first

clients involved divorces, lease negotiations, and unlawful detainers, the majority of which were referred by Rabbi Goldstein.  However, over time, Elliot Adler shifted the focus of his representation.  His extremely hard work helped his law firm grow to a boutique law firm with approximately 20 employees primarily representing plaintiffs who have had to endure life changing circumstances through the neglect of large corporations.

Mr. Adler's success in the practice of law is attributable to his incredible work ethic and the fact that he truly cares for the well-being of his clients.  Mr. Adler soon began representing the victims of various wildfires throughout the state, and ultimately in other complex litigation throughout the country.  As a result, his caseload and the number of clients he was representing increased exponentially.  By 2022, just before his resignation, his firm was representing approximately 5,689 individuals.



The reason for the huge increase in cases was Mr. Adler's personal involvement in meeting with clients, caring about what happened to them, and rigorously representing them.

> "Again, I was extremely impressed with Elliot's concerns for our clients, and his drive to maximize their recovery.  It seemed that every client wanted to speak with Elliot directly because they felt a bond had developed and they trusted him."
> (Alex Schack, Exhibit O).

22-CR-821-BAS-1

That commitment to clients involved extremely long work weeks and endless travel to distant places to meet with clients about their matters:

> "One truth we know about Elliot is how hard he has worked to build up his law firm. He is very humble about it, but we know that from the first day he opened his practice, he has been a fierce advocate for his clients. I know that Elliot at times had to sleep in his car when working out of town to meet with clients. I also know that on many occasions, he helped financially suffering clients by giving them money to rent an apartment, buy school supplies for their kids, or even a much-needed surgery. We're not that familiar with the law professional, but it appears to us that he's gone way beyond what most lawyers do for their clients." (Nathan and Caren Adler, Exhibit W).

Another attorney who has worked with Mr. Adler in the past noted the following:

> "…building his practice from a one-person shop to one that employs over 15[sic] individuals. This is because he truly cares about people and it shows. The attorneys and staff at my office often comment on how pleasurable it is to work with Elliot, as he meets his deadlines and lives up to his promises, as well as being extremely courteous to everyone, from attorneys to receptionists."(Alex Schack, Exhibit O).

In the words of another attorney representing people in wildfire litigation:

> "It takes a lot to lose everything, and trust in a stranger's word that they will make things right. And yet Elliot kept his word, and empowered thousands of people to rebuild their lives. Mr. Adler's positive impact cannot be overstated. I am extraordinarily proud to have worked with Elliot to help so many fire victims." (Demetrios Sparacino, Exhibit N).

As an attorney, Mr. Adler developed an excellent reputation for representing his clients. He has represented politicians on both sides of the aisle--two California mayors, both democrats and two United States Congressmen, both republicans. Mr. Adler built that representation by working hard, caring about his clients, and honestly representing his clients. A retired Superior Court judge presiding over multiple wildfire cases noted:

> "Mr. Adler was an attorney that was completely transparent in all his dealings with me and demonstrated impeccable honesty and integrity. He never once tried to gild the lily or obfuscate facts that were not favorable to him." (Hon. Peter Lichtman, Exhibit I).

An attorney with whom he frequently worked commented about Mr. Adler:

22-CR-821-BAS-1

"He and I tried several bench trials in state and bankruptcy court and he was well liked and his professionalism complemented by the judges in those matters." (Geoffrey Marr, Exhibit R).

Perhaps the most telling comments come from a defense attorney he opposed, Mr. Douglas Dixon, who represents Southern California Edison as lead defense counsel in the wildfire litigation cases Mr. Adler brought on behalf of his clients:

"Through our interactions these past four years, I have come to know Mr. Adler as an honest, passionate, and experienced advocate for his clients. We didn't always see eye to eye, and indeed, the litigation was, at times, antagonistic. We likely disagreed more than we agreed on substantive legal issues. But Mr. Adler was always polite and professional. I respected the positions Mr. Adler took in advancing his clients' claims and the way he pursued their interests. Mr. Adler was a very worthy adversary who served his clients well. Indeed, I understand that on several occasions that Mr. Adler reduced his fees so as to get his clients' cases settled." (Douglas Dixon, Exhibit J).

Mr. Adler's representation was not however, limited to just complex litigation matters. He continued to represent people in all types of litigation if he felt it was right to do so, many times without regard for fees.

"He also took cases when people could not find a lawyer. Like an immigrant woman in our community who had been abused and wanted to get a divorce, or someone who was being abused by a landlord with unfair eviction." (Sami Ladeki, Exhibit P).

In other matters, Mr. Adler went out of his way to help the victims in his cases:

"He shared with me that he had loaned money to a client who was a victim of the Paradise Fire so that she could obtain stable housing. The client was living in her car with her young child and was terrified that she would lose her child due to her circumstances. Although settlement of the client's case was not imminent, Mr. Adler was moved by her plight and assisted her with the necessary funds to protect her relationship with her child." (Regina Bagdasarian, Exhibit EE).

Another client described their experience with Mr. Adler's representation:

"First, I was involved in my parent's catering business a few years after graduating college. Soon after I joined, we were approached by a competitor who offered an alliance/merger. We accepted the terms at the time, but once Elliot heard the details and read the contract we were presented with, he warned me that this competitor had bad intentions,

22-CR-821-BAS-1

and that their end goal was to drive us out of business.  Elliot was able to save my family's business as he guided me every step of the way, through a myriad of contracts, letters of intent, negotiations, and ultimately the avoidance of costly litigation.  And he did so pro bono."
(Morris Levy, Exhibit U).

The numerous comments and letters from friends, colleagues, opponents and even a judge presiding over his litigation portray a man who selflessly devoted himself to the representation of individuals wronged in some way.  That representation was in many instances extraordinary, sleeping in his car to meet clients in out of the way locations—clients who had lost everything and could not afford to travel to meet with an attorney. The comments and letters also reflect that as an attorney, Mr. Adler's representation was not just about getting paid.  On many occasions, he handled cases for individuals who could not find or afford another attorney.  In other instances, he went out of his way to help the clients, giving them money for surgeries, housing, and even schoolbooks. The Elliot Adler representing all these people, generous with his time and his money, stands in stark contrast to the Elliot Adler who involved himself in cheating on his taxes.

**C. Elliot Adler's Involvement in the Offense.**

Mr. Adler first became involved in what he now has learned was a long-standing scheme involving many others at the request of Rabbi Goldstein.  Mr. Adler has personally struggled in coming to grips with his repeated involvement and the magnitude of his last claimed donation.  At the time, in 2017, Mr. Adler's practice was producing significant revenue.  For the better part of his legal career, he struggled with income, relying heavily on his wife's income to support the family. In the back of his mind, he always feared that financial pendulum would swing the other way.

Mr. Adler truly regrets his involvement.  His actions were wrong.  He now knows that his law practice from 2017 to 2021 turned out to be extremely financially successful. Since his filing of the 2017 tax return, Mr. Adler has now paid very significant federal taxes as noted in the table below.  Although he sought to unlawfully reduce his tax obligations, unlike other defendants in related cases, he did not attempt to avoid paying taxes altogether.



However, in his words to the probation officer, Mr. Adler explained: "There is no excuse for what I did."   Nonetheless, those who know Elliot Adler expressed their surprise, shock and dismay to learn of his involvement:

> "Of all the people I associate with professionally and socially, Elliot would be near the bottom of the list of persons that I thought would engage in the wrongful conduct he described." (Matthew Dart, Exhibit FF).

> "The news of Elliot's charge, and his subsequent plea, came as a complete shock to me. I have known Elliot for years, but this was entirely out of character." (Edwin Boniske, Exhibit CC).

> "His actions in this tax matter are so out of character for him that I was shocked when he and I discussed this matter. He has taken responsibility and is very remorseful." (Steven Lash, Exhibit RR).

An attorney mentored by Mr. Adler said the following:

> "The current situation surprises me, as Elliott's advice was also always ethical and about doing the right thing." (George Stiefel, Exhibit NN).

### D. Mr. ADLER's Sincere Remorse, Contrition, and Acceptance of Responsibility

Mr. Adler has been candid about his misconduct and is fully aware of its wrongfulness.   Probation Officer Morrill, who conducted the Presentence Interview, immediately recognized Mr. Adler's remorse.

22-CR-821-BAS-1

However, beyond just accepting responsibility for his actions, Mr. Adler has repeatedly and sincerely expressed his remorse.  In his letter to the Court, Mr. Adler discusses his deep sense of remorse and shame over his conduct. (Elliot Adler, Exhibit F). To everyone with whom he has had contact, including some even before his guilty plea, Mr. Adler has been open, expressing tremendous regret, sorrow and experiencing an equal amount of shame.  In doing so, Elliot Adler has not tried to minimize his responsibility or pass the blame.

> "He acknowledged what he did and plainly stated to me that he should have known better and that he was sorry for having done so at a time when it would be easier for most people to try to blame this error on someone else's influence."  (Jeremy White, Exhibit S).

Mr. White's observation is important because although others have offered their opinions about Rabbi Goldstein's influence in getting Elliot Adler involved in the offense, Mr. Adler has never attempted to blame anyone else but himself.  Unlike so many others in the criminal justice system, Mr. Adler recognizes that he is the one responsible for his actions.  With that recognition comes the self-realization that he can never again do anything like this.

Others, who know both Elliot Adler and Rabbi Goldstein, have remarked about the fact that Elliot Adler has not tried to place the blame for his actions on the rabbi:

> "When Elliot told me about this, he did not blame anyone else. He only blamed himself. He's very persistent about this viewpoint. But I know that Elliot has always been a follower of his faith. And while I was surprised to learn about the bad judgments he made, I know that he would never would have gotten involved in anything like this without having been solicited by his spiritual leader or believing that he was providing help to his temple. (Sami Ladeki, Exhibit P).

Mr. Adler expressed his remorse to practically everyone he knew, including retired Judge Lichtman, overseeing the mediation protocol for multiple wildfire cases he was previously handling:

> "In speaking with me, I was completely taken aback with his admission of responsibility and remorse. He admitted to me without hesitation his transgressions, demonstrated accountability for his actions and

22-CR-821-BAS-1

tremendous regret. In today's climate, I found his honesty to be refreshing and admirable." (Hon. Peter Lichtman, Exhibit I).

Mr. Adler even expressed his remorse to opposition counsel:

"After a mediation earlier this year involving his law firm at which he was uncharacteristically missing, he called to tell me why. He explained that he had made some foolish decisions, was being investigated for tax fraud, and would be relinquishing his law license and stepping away from his firm. He owned up to his mistakes and never once sought to excuse them. Mr. Adler certainly did not have to call me—an attorney on the opposite side of cases from his clients—let alone share with me the details of his admitted lapses of judgement. But he did. And I think that speaks volumes to his character." (Douglas Dixon, Exhibit J).

His colleagues have consistently noted his remorse:

"He kept apologizing to me over and over again. I don't know if anyone was harder on Elliot than he was on himself, as it is just so out of his character. (Alex Schack, Exhibit O).

"I know firsthand that Elliot has agonized over what he has done and the pain he has caused his wife and children. He is deeply remorseful. He tells anyone who will listen about his bad decisions, including all the millennials that look up to him, how wrong it is to break the law, and how much you can lose from it. He does not want other people to make the same bad choices he did." (Jim Neil, Exhibit V).

"His primary concern has always been the effect this will have on his wife, children, parents, close friends and colleagues. He was similarly concerned for his clients, associates and staff in Adler Law Group. He even apologized to me since he thought he had let me down given our close personal relationship."(Geoffrey Marr, Exhibit R).

And of course, his family has seen his sincere remorse:

"Elliot is beside himself with grief for his terrible misjudgments. He has embarrassed himself and devastated his family. During this trying time of uncertainty, Elliot still remains more concerned about how his actions have affected others than the jeopardy he faces. We also see him trying to explain to others what a bad choice it is to break the law." Travis and Jaclyn Lash, Exhibit QQ).

Even more powerful than simply verbally expressing his sorrow, Mr. Adler has taken actions to make sure other lawyers do not make the same terrible decisions he did.

22-CR-821-BAS-1

As noted in the correspondence of Professor Timothy Casey:

> I believe that Mr. Adler has demonstrated remorse for his criminal behavior and he has communicated to me his desire to help others, especially new lawyers, to learn from his experience… ***I believe Mr. Adler has something to offer in pursuit of improving our profession. His story could help others increase awareness about how ethical and criminal violations occur and highlight the penalties that accrue at the end of the road. A narrative where one recognizes his transgressions and seeks to prevent the same from recurring in the future has strong support in our experience and in our legal precedent.*** (Professor Timothy Casey, Exhibit G) (Emphasis added).

This is the type of behavior recognized in *United States v. Green*, 152 F.3d 1202 (9th Cir. 1998), as forming the appropriate basis for a downward departure.

### E. Mr. Adler's Kindness, Volunteer Work, Charity, and Generosity to Friends and Colleagues.

Before *United States v. Booker*, 543 U.S. 220 (2005), a departure must have been present to an extraordinary degree. *United States v. Anders*, 956 F.2d 907, 912 (9th Cir.1992). In *United States v. Cooper*, 394 F.3d 172 (3rd Cir. 2005), a securities fraud and tax evasion case, with a sentence range of 14-21 months, a four-level departure for "good works" and sentence of probation was warranted for the defendant's "exceptional" good works. There, the defendant did not simply donate money to charity but also organized and ran a youth football team in a depressed area, mentored its members, and helped several members attend better high schools or go to college, which qualified as exceptional because they entailed "hands on personal sacrifices which have a dramatic and positive impact on the lives of others."

Mr. Adler's charitable giving, volunteer work and random acts of kindness have been exceptional. While in law school, in addition to working part-time to help pay for his tuition, Mr. Adler volunteered his time to work in the "Innocence Project" focusing on assisting convicted prisoners seeking to prove their innocence through DNA testing. Mr. Adler worked on two successful cases. The first involved Neil Miller, who was wrongfully convicted of rape and who had already served ten years in prison. On May

11, 2000, his conviction was overturned, due in part to Mr. Adler's hard work on the case. (See Boston Herald article, Exhibit XX).

> "What I found more benevolent was the degree to which Elliot later followed up with him, further assisting the man and helping him successfully return to society.  I understand that Elliot went with him to speak at conferences and assisted him with getting a job." (Howard Ost, Exhibit DD).

A law school colleague witnessed Elliot Adler's generosity and kindness first-hand in New York:

> "…I want the judge to know the Elliot I've come to know over the decades.  The Elliot I witnessed take the sweatshirt off his back in the dead of the New York winter, to give it to a homeless person.  The Elliot that routinely volunteered to help aging, lonely Holocaust survivors in the United States and Israel.  (Edward Manor, Exhibit K).

When first returning to San Diego from law school, he began serving soup to the homeless in Pacific Beach.

> "He frequently served soup to the homeless community and encouraged others to do the same, and because of Elliot, this outreach became an integral part of our organizational mission." (Rabbi Yossi Tiefenbrun, Exhibit HH).

Over the years, he has offered summer internships at his law firm for Jay Gonzalez's daughter, Jim Neil's son and many others.

> "I have no doubt that Elliot went out of his way to build my son's confidence and provide him an inspiration and skill set to do impactful work in the community." (Jim Neil, Exhibit V).

Mr. Adler has also volunteered his time as a Judge pro tem in the Superior Court, and adjudicated over 100 matters.  (See Certificate of Appreciation, Exhibit YY).  Outside of the legal profession, he has volunteered his time.  He has coached numerous basketball, baseball and soccer sports teams for his son and others.

Coach Mills provided yet another example of Elliot Adler's true nature:

> "I mentioned my work with underprivileged kids, and he quickly offered to provide assistance any way he could.  He made an anonymous donation for two basketball teams league fees and new uniform which helped so many kids.  He is a giving person who quietly does it from his heart without seeking recognition." (Raynell Mills, Exhibit M).

The principal of the school which Mr. Adler's children attend, also noted his generous charitable acts:

> "I recall a time when a class trip involving one of his children took place. Elliot's primary concern became whether all of the kids would be able to go. He told us that he would cover the costs for a child who could not afford the trip to ensure they would share in the experience." (Rabbi Simcha Weiser, Exhibit GG).

Mr. Adler's past actions reflect a true intention to help his community, without seeking any recognition for his efforts. Mr. Jeromey Lewis also noted how Elliot Adler paid for the whole Little League team he was coaching to attend a hockey game, to promote their interest in sports. (Jeromey Lewis, Exhibit AA).

His acts of kindness go beyond financial support for charitable organizations:

> "He has helped bring estranged family members together after long time quarrels, and has dedicated much of his time to volunteering with Holocaust survivors. He is the first person I turn to for assistance with a community problem beyond my reach, and he is always willing to offer help. He never wants anything in return. (Rabbi Yossi Tiefenbrun, Exhibit HH).

Mr. Adler has helped the community in many other ways. He has handled countless pro bono cases for clients, trying to protect these individuals from being wronged as noted by Morris Levy and Sami Ladeki. Most notably, he has represented the Chabad of Poway repeatedly on a pro bono basis. Years before the horrific and antisemitic shooting in April 2019, Rabbi Goldstein expressed fear about an individual who was making antisemitic and threatening remarks to preschool children at the Chabad. Mr. Adler sought and obtained a restraining order against the individual, *Chabad of Poway Inc./Chai Preschool & Infant Ctr vs. Elliot Trestman*, Case No. 37-2013-00055440-CU-PT-CTL. Mr. Adler filed this action to protect the children attending preschool and he did it without thought of financial compensation.

Another instance of his pro bono work is noted by Ms. Anna Lewis:

> "At the time, our family endured a significant medical crisis with Sasha, exacerbated by negligence at the Children's Hospital. Jeromey and I were overwhelmed and exhausted when Elliot – himself a new parent and

22-CR-821-BAS-1

young lawyer -stepped in, offering to handle all the legal wrangling that ensued, completely free of charge.

Elliot achieved the result we needed, which was not easy. The process lasted months and required numerous letters, paperwork, and tenacious follow-up and advocacy on our behalf." (Anna Lewis, Exhibit BB).

Mr. Adler has continued his efforts to serve the community throughout his life, even once running for the Board of Trustees for the Mira Costa Community College District board:

"Several years ago, Elliot ran for a local school board position. A successful attorney putting himself into the education world with all that requires reflects his passion for our community. Most of us are busy with our careers, family, and other activities, but Elliot is committed to the greater good. Although he did not win that election, it did not deter him from continuing his volunteer and other philanthropic activities." (Alan Peller, Exhibit LL).

Since 2018, Mr. Adler has continued his generous financial support of charitable organizations, donating slightly under $100,000 to different organizations and a different synagogue, Chabad of Pacific Beach.  In addition, in light of his current jobless status, Mr. Adler has volunteered at Mama's Kitchen, an organization which provides meals to "San Diego residents at risk of malnutrition due to critical illnesses such as HIV, cancer, congestive heart failure, type 2 diabetes, and chronic kidney disease."  (Mama's Kitchen, Exhibit H).  He has already worked four shifts, volunteered at locations where Mama's Kitchen has had difficulty finding help, and waived any type of gasoline reimbursement.

It is well established that "a defendant's rehabilitative efforts can, in an appropriate case, form the basis for a downward departure." *United States v. Maier*, 975 F.2d 944, 945 (2d Cir. 1992).  The court may consider many factors, such as regular employment, volunteer work, and status as a provider and productive citizen, in determining whether a defendant is entitled to a lower sentence for extraordinary rehabilitation. E.g., *United States v. Normandeau*, 63 Fed.Appx. 573, 576 (2d Cir. 2003) (volunteer work is a relevant

22-CR-821-BAS-1

consideration)[1]; *United States v. Bryson*, 163 F.3d 742, 749 (2d Cir. 1998) (regular employment and helpfulness at home are relevant considerations); *United States v. Rodriguez*, 724 F.Supp. 1118, 1119 (S.D.N.Y. 1989) (providing for family and becoming a "productive citizen" are relevant considerations). All this prior and subsequent good conduct merits some consideration in determining the appropriate sentence for Elliot Adler.

## E. Collateral Consequences

Under a departure analysis or an 18 USC § 3553(a) analysis, many courts have reduced sentences when a defendant has suffered significant collateral consequences from a conviction.[2] For instance, in *United States v. Redemann*, 295 F. Supp. 2d 887 (E.D. Wisc. 2003), the defendant had been civilly prosecuted by the office of the comptroller of the currency and had to pay $75,000, suffered adverse publicity in a small town, ruined his business, and caused ill health and the ultimate death of his wife—so "the primary purposes of sentencing were partially achieved before the case was filed....and [the collateral punishment] partially satisfied the need for just punishment—district judges may consider such successive punishments ...in deciding whether to depart . . ." *Ibid*. Likewise, in *United States v. Gaind*, 829 F.Supp. 669 (S.D.N.Y. 1993) the court departed in part because the destruction of the defendant's business already achieved to a significant extent some, although not all, of the objectives otherwise required to be sought through the sentencing process.

In this case, Mr. Adler's involvement in this offense and guilty plea have already caused the following consequences:

---

[1] In accordance with the instructions in that case, the <u>Normandeau</u> decision is not cited as precedential authority here; Mr. Adler simply wishes to call the case to the Court's attention.

[2] The Government cites a number of cases for the proposition that this Court should not consider the loss of his professional license in determining the sentence for Mr. Adler. Those cases mostly involved tax attorneys or misconduct related to the defendant's professional responsibilities. Federal courts have routinely recognized that the collateral consequence including loss of a professional license or immigration status is clearly a factor to be considered in determining the appropriate sentence.

22-CR-821-BAS-1

- Mr. Adler has notified the California State Bar of his conviction, (See Exhibit ZZ) and has ceased practicing law.  The State Bar action has suspended his license pending further notice. (Exhibit AAA)

- He has been forced to resign from his law firm, Adler Law Group, effective April 1, 2022, even before he entered his guilty plea in this case.  This is a law firm he worked 90-hours a week to build, starting out with just a single lawyer and building up to a 20 person firm with over 5,000 clients.

The many people who have worked with or been represented by Elliot Adler have noted the devastating impact his resignation and anticipated disbarment has already had on him.

> "For real lawyers the profession of advocacy is life itself. Elliot, in disbarment, will lose his life's role." (Duncan L. Hunter, Exhibit Q).

> "While this tragedy befalls his family in ways unimaginable, there is also a tragedy in the loss of a great advocate for the victims that he represented. A true loss to the profession." (Hon Peter Lichtman, Exhibit I).

> Succinctly stated, Mr. Adler "is the gold standard for the law profession that all attorneys should aspire to. It saddens me the profession will be losing a star." (Steven Lash, Exhibit RR).

> "We have witnessed firsthand how much he has anguished over losing his right to represent the clients he cares so very dearly about. As we indicated, there have been many sacrifices made to earn the right to hold that precious law license, and now that right, along with the life he has worked so hard to build has been destroyed" (Nathan and Caren Adler, Exhibit W).

> "… now it pains him that he will never again be able to practice law, which is his passion and has enabled him to help improve hundreds of lives. He will always suffer from this loss of privilege, and so will his family." (Jeremy White, Exhibit S).

> "I also understand he has agreed to relinquish his license to practice law, which was devastating to Elliot (as he has devoted years of his life and thousands of hours towards building a practice that he can no longer be involved with). Elliot was at the peak of his career as an attorney when

it abruptly came to end. The loss of his successful practice and his legal career overnight has stunned many people in the community, and has undoubtedly sent a strong message." (Edwin Boniske, Exhibit CC).

"It is also worth noting that the sudden loss of a successful legal career by an attorney in their prime has been witnessed by legal communities up and down the state where Elliot recently practiced." (Alex Schack, Exhibit O).

Mr. Adler's reputation in the legal community has been ruined, limiting his work options.

"Mr. Adler was an attorney that was completely transparent in all his dealings with me and demonstrated impeccable honesty and integrity. He never once tried to gild the lily or obfuscate facts that were not favorable to him." (Hon. Peter Lichtman, Exhibit I).

In his letter to the Court, Mr. Adler expresses what a blow this case has been to his sense of self and to his reputation in the community. His loss of reputation is significant in that he had strived to build a reputation of honesty in dealings and a high level of ethics. That reputation is now devastated.

- With a felony conviction, he will have difficulty finding any work comparable to what he has been doing or support himself in the manner he had been doing in the past.
- Even financial institutions holding his personal checking and savings accounts have terminated their relationships with him.
- *All* of his fraudulent charitable donation deductions have been voided. Under his plea agreement, Mr. Adler does not even get credit for the approximate 10% of the donations that he truly believed were being given to the Chabad of Poway as a charitable donation. On top of that, Mr. Adler has been assessed a 75% "fraud penalty" and charged interest, for a total tax and penalty liability of $1,049,573.67.
- Mr. Adler has agreed to forfeiture of all of the gold coins purchased by the rabbi with the approximate 90% of the fraudulent charitable deduction. The 246 Suisse Fortuna 1 ounce rectangular gold ingots, the 246 Canadian Maple Leaf 1 ounce gold coins, and the 246 American Eagle 1 ounce gold coins belonged to Mr. Adler, although it is not clear to the defense why Rabbi Goldstein claimed an interest in the gold in his plea agreement. In any event, at the time of their purchase, the gold coins and ingots were valued at $1 million. Now

22-CR-821-BAS-1

that gold is valued at $1,416,074.40.[3]  Consequently, Mr. Adler is forfeiting approximately $366,000 more than his total tax liabilities, including fraud penalties and interest.  This action will end up costing Mr. Adler almost 3 times more than he was ever attempting to save by cheating on his taxes. ($505,659 per the financial addendum). This forfeiture alone is a very significant deterrent to anyone contemplating cheating on their taxes.

In summary, Elliot Adler will undoubtedly lose his law license, something he worked particularly hard to get—working part-time while in law school to help pay the tuition.  He has now lost his law firm, something he has worked his adult life first to obtain and then to develop as part of a career at a leading law firm.  He has lost a career that, in many ways, defined his life. Further, the conviction challenges a belief that is central to his identity: that he has always held himself to the highest ethical and professional standards.  Now it is the conviction itself that is central to his identity.

His reputation has been destroyed.  Consequently, before any sentenced has been imposed, Mr. Adler is being punished severely by losing his law license, his law firm, his standing in the community and his reputation. As a result, Elliot Adler has hit rock bottom, all without any sentence being imposed in this case.  He will never be in a position to commit an offense like this again.  Nor would he ever even consider doing so.

## IV.
## <u>MR. ADLER'S FAMILY CIRCUMSTANCES</u>

Courts have uniformly affirmed that unique family circumstances should be given due consideration by the sentencing courts as a factor under 18 U.S.C. § 3553(2). *See United States v. Autery*, 555 F.3d 864 (9th Cir. 2009); *United States v. Menyweather*, 447 F.3d 625, 634 (9th Cir. 2006); *United States v. Haversat*, 22 F.3d 790 (8th Cir. 1994); *United States v. Gaskill*, 991 F.2d 82 (3d Cir. 1993); and *United States v. Leon*, 341 F.3d 928 (9th Cir. 2002).  Importantly, Mr. Adler does not suggest that his family circumstances somehow mitigate his actions or lessen his culpability for this offense.  Mr. Adler quite clearly recognizes that he brought on these consequences by his own actions.

---

[3]  This valuation fluctuates daily and is based upon the published price at https://www.moneymetals.com/buy/gold as of June 30, 2022

22-CR-821-BAS-1

However, as noted by the court in *United States v. Schroeder*, 563 F.3d 746, 756 (7th Cir. 2008), "[T]he fact that the consequences of incarceration are attributable to his own misconduct may be a factor in the analysis but it is not the sole factor nor is it dispositive."

Mr. Adler is requesting that the court impose a split sentence, with six months actual custody and six months house arrest. This sentence accommodates Ms. Adler's unique medical condition, the concerns about the welfare of the children, and is appropriate under the advisory guidelines. This request is "not made on behalf of the Defendant himself, but on behalf of his family" as recognized by the court in *United States v Cabell,* 890 F.Supp 13, (D.D.C. 1995).

As the court is undoubtedly aware, when one parent in the household is afflicted with a medical condition, general experience is that the children lean more heavily on the non-afflicted parent for emotional and psychological support. The fact that the Adlers are in a financial position to hire a nanny to assist with daily routines, and also have people who could assist part-time with childcare and provide financially for them, is not really the question. The true issue is whether Mr. Adler's prolonged incarceration will wreak emotional and psychological havoc on his family—both his wife and his children. *See United States v. Johnson,* 964 F.2d 124, 129 (2d Cir. 1992) ("The rationale for a downward departure here is not that [the defendant's] family circumstances decrease her culpability, but that we are reluctant to wreak extraordinary destruction on dependents who rely solely on the defendant for their upbringing.")

Here, given the information before the court, serious concerns have been expressed about the effect a lengthy incarceration will have on the Adler family. In light of the particular nature of their family circumstances, this is not just a hypothetical concern, but rather a well-founded concern. Mr. Adler respectfully requests that the Court take into account that general experience of reliance on a particular non-afflicted parent and Mr. Adler's particular circumstances and allow Mr. Adler to serve a portion of his sentence with house arrest.

Not only would that best serve the welfare of the children who have clearly grown more dependent on him, given their mother's condition, but it would also quite frankly help Ms. Adler, who has also grown dependent on Mr. Adler for his emotional and psychological support.  Having someone at home on whom you can rely for help is a tremendous boost for anyone.  Given this family's unique situation, the ability to rely on Mr. Adler is critical to the long-term welfare of both his children and his wife.

The government takes issue with Mr. Adler's request that the Court consider his unique family circumstances when fashioning an appropriate sentence. But the cases and arguments raised by the government are anachronistic—all predating *Booker*. Significantly, the government does not dispute that Ms. Adler has a serious medical condition. Nor does the government dispute Mr. Adler's unique role in the family. Nor does the government dispute that these circumstances cannot be considered by this Court in determining the most appropriate sentence. Here, the Adler's unique family circumstances support the requested sentence.

## V.
## <u>CONCLUSION</u>

In this case, the Probation Officer who personally interviewed Mr. Adler and analyzed the impact this prosecution has had on him has submitted a recommendation for a sentence of 5 years' probation with a condition that he perform 100 hours of volunteer work/community service. Although the Government makes light of this recommendation, the Supreme Court and Ninth Circuit have recognized that probationary sentences are punitive in nature.  In *Gall v. United States*, 552 U.S. 38, 48 (2007), the Court stated that a term of probation involves a "substantial restriction of freedom." See also *United States v. Knights*, 534 U.S. 112, 119 (2001), ("Inherent in the very nature of probation is that probationers 'do not enjoy the absolute liberty to which every citizen is entitled.")  Most recently, the Ninth Circuit noted that even probationary sentences "are quite oppressive given that probationers 'are subject to several standard conditions that substantially restrict their liberty.'" *United States v. Ruff*, 535 F.3d 999, 1004 (9th Cir. 2008) *quoting Gall*, 552 U.S at 48.

24

In *Gall v. United States*, 552 U.S. 38, 599 (2007), the court also expressly addressed the Government's objection that there was no general deterrence from a probationary sentence:

> The Government's legitimate concern that a lenient sentence for a serious offense threatens to promote disrespect for the law is at least to some extent offset by the fact that seven of the eight defendants in this case have been sentenced to significant prison terms.
> *Gall v United States*, *supra*, at 54.

Here, as in *Gall*, this Court has already sentenced defendants in a number of related cases, all involving Rabbi Goldstein's tax fraud, and some of those defendants have received probationary sentences.  However, Mr. Adler recognizes that the serious nature of the offense calls for some time in custody.  For a soon to be disbarred lawyer, even thirty days in custody seems like an eternity.

Accordingly, Mr. Adler respectfully submits that a split sentence of six months custody and six months house arrest, including a term of supervised release ordering him to complete 250 hours of volunteer work/community service, something Mr. Adler has repeatedly already done throughout his life, would be "sufficient, but not greater than necessary" to accomplish the goals of sentencing.  *United States v. Kimbrough*, 128 S. Ct. at 570.

In the words of former Congressman Duncan L. Hunter, Sr.:

> "America, in my view, is about renewal...the second chance.  Please allow Elliot the opportunity to renew his life and his service to our community.  He is a human being of great value." (Duncan L. Hunter, Exhibit Q).

Dated: <u>August 12, 2022</u>                    Respectfully submitted,

    <u>s/Patrick .Q. Hall & John C. Ellis</u>
Patrick Q. Hall & John C. Ellis
Attorneys for ELLIOT ADLER

25